## Case No. 6,968.
### HYDE v. CORRIGAN.
[9 N. B. R. 466.] [1]
District Court, D. California. April, 1874.

INSOLVENCY—FAILURE TO APPLY FOR BENEFIT OF BANKRUPT ACT.

Wilson v. City Bank of St. Paul [17 Wall. (84 U. S.) 473] examined, and *held* not to cover a case where a debtor who is utterly insolvent, and with no reasonable prospect of being able to pay his debts, fails to apply for the benefit of the bankrupt act [of 1867 (14 Stat. 517)], but passively permits certain creditors to appropriate all his assets to their debts. Such a case is not that "honest struggle to meet their debts and to avoid the breaking up of all their business," referred to by the supreme court.

W. W. Foote, for plaintiff.
J. Chadbourne, for defendant.

HOFFMAN, District Judge. This is an action brought by the assignee of John Jackson, a bankrupt, to recover back certain moneys alleged to have been paid by the bankrupt to the defendant, (a creditor) in fraud of the provisions of the act. The testimony discloses the following facts: The bankrupt was indebted to the defendant for moneys loaned, which the latter had borrowed at bankrupt's request from a third person. About a year after this money was lent, the person from whom Corrigan had borrowed it, demanded re-payment, and Corrigan thereupon made a demand on the bankrupt, who replied that he would sell some sheep and get the money. About a week afterwards, Corrigan received a dispatch from a friend in this city informing him that the bankrupt was about to return to Red Bluff, near which he resided, and advising him to get his money. It would seem that the bankrupt had succeeded in obtaining moneys from parties in this city to whom he stated that "he was hard up" and wanted help. The money was lent by them to enable him to pay off his debts. This at least is the bankrupt's statement, and it is not contradicted. On the arrival of the bankrupt at Red Bluff, Corrigan demanded his money, and the next day commenced suit, threatening to attach all the bankrupt's property, which was very considerable, unless a settlement was effected. The bankrupt promised to pay in a few days, and about a fortnight after did pay Corrigan in full, having obtained the means of doing so by the sale of some sheep. In the meantime two other attachment suits had been commenced by other creditors. These, with two other creditors who had not sued, were paid about the same time, but before the payment to Corrigan. These

transactions occurred in the early part of June, 1872. About two months afterwards an attachment suit was commenced against the bankrupt by one Wellington, and about one month thereafter another suit was brought by Kraft.

The petition in bankruptcy was filed on the 2d day of October, a little less than two months after the commencement of the last suit. It being admitted that the debt to the defendant was justly due, he cannot be held liable in this suit unless it appear that at the time the payment was made the bankrupt was insolvent or in contemplation of insolvency; that he made it "with a view" (section 35), or "with intent" (section 39), to give a preference to a creditor, and the creditor receiving the payment had reasonable cause to believe the debtor to be insolvent, and "that the payment was made in fraud of the act" (section 35), or "that a fraud on the act was intended" (section 39). With respect to his condition at the time of the payment to Corrigan, the bankrupt testifies: "I was under the impression I was insolvent, but I thought that if they didn't press me, I could collect some old debts and meet all my liabilities. I could not say whether I knew I was insolvent. I was in hopes not to be; I was trying to pull through. I think I could have collected those old debts. They would have paid me when they wouldn't pay the assignee. I didn't give up all hopes until thirty or forty days afterwards; I was disappointed in getting moneys. I was in hopes when I paid Corrigan to be able to pay every one, if they didn't press me, but not, if they did. I told Corrigan he was the cause of the other parties suing me. I hoped to pay off these loans," (obtained from parties to whom he applied for assistance,) "from increase of sheep wool and these old debts." At the time the payment to the defendant was made, the bankrupt was possessed of considerable property—a large rancho, five thousand sheep, some thirty American horses, cattle, etc. He had also a rancho in Trinity county, which he wished the defendant to take for his debt. Mr. Wellington, a creditor, to whom the contents of the dispatch above referred to were communicated, testifies that about the time Corrigan's suit was commenced he applied to the bankrupt for payment. He was assured by Jackson that he was able to pay all his creditors; he said he had ranchos, sheep, cattle and horses, spoke of a rancho in Trinity county, saw he could pay if let alone. On the strength of these assertions Mr. Wellington "concluded not to trouble him." The bankrupt continued to live on his rancho, doing business as usual for some months after his payment to Corrigan. His petition was filed only four days before the expiration of the four months fixed by the statute as the period within which the payment to Corrigan could be assailed.

The recent decision of the supreme court in the case of Wilson v. City Bank of St. Paul [17 Wall. (84 U. S.) 473] has modified, in some important respects, the interpretation given by many of the district courts to the clause in section thirty-nine relating to the suffering by an insolvent of his property to be seized on legal process. It had been held that the omission of an insolvent to prevent the seizure of his property on attachment or execution by filing a voluntary petition in bankruptcy, constituted a suffering of his property to be taken on legal process, and inasmuch as such taking was the natural and probable consequence of his inaction, and the effect of the proceeding would, if not arrested, be to enable one creditor to obtain an advantage over the rest, the insolvent must be deemed to have suffered his property to be taken with the intent to give a preference. But the supreme court refused to adopt the view upon which this interpretation of the act was based. They declared that a person in embarrassed circumstances and unable to meet all his engagements as they accrue is not under any legal or moral obligation to go into bankruptcy and thus convert what may be a temporary embarrassment into final ruin, any more than a master is bound to voluntarily strand his vessel when as yet it is not known whether he may not weather the storm or escape the shore. That to hold his omission to do so to be an act of bankruptcy is to give creditors the right to initiate a proceeding in bankruptcy against insolvents in a class of cases not enumerated in the act, viz: those where the debtor ought himself to go into court as a bankrupt and fails to do it, and this on the ground that the act requires him, under the circumstances, to become a "voluntary," bankrupt. It being thus established that the insolvent is under no legal or moral obligation to go into voluntary bankruptcy, it necessarily followed that his failure to do so furnished no evidence of the fraudulent intent which is made by the act an element of the act of bankruptcy. The general proposition that a man must be held to intend the natural consequences of any positive act committed by him was admitted, but it could not be inferred that a man intends, in the sense of desiring, promoting or procuring a result of other persons' acts when he contributes nothing to their success or completion, and is under no legal or moral obligation to hinder or prevent them.

On these grounds the lien obtained by a judgment creditor in the ordinary course of law, and without any complicity on the part of the debtor, was sustained against the claim of a subsequent assignee in bankruptcy, notwithstanding that the creditor, at the time he commenced his suit, was aware of the insolvent condition of his debtor. This decision seems substantially to adopt the view expressed by Bradley, J., in his dissenting

opinion in Buchanan v. Smith [16 Wall. (83 U. S.) 277]. In that opinion Bradley, J., holds: "That an adversary suit may be prosecuted to judgment up to the very moment of bankruptcy. The creditor is not bound himself to petition against his debtor in bankruptcy, nor does the neglect of the debtor to file such petition deprive him of his fairly gained preference unless complicity between them be shown." But slight circumstances will be sufficient to show such complicity. In Wilson v. City Bank of St. Paul [supra], the court observes: "Undoubtedly very slight evidence of an affirmative character of a desire to prefer one creditor, or of acts done with a view to secure such preference, might be sufficient to invalidate the whole transaction. These cases must rest on their own circumstances."

What, then, are the circumstances of the case at bar? At the time of the payment to the defendant he was clearly insolvent. Technically so, by his own admission, for he knew that if pressed he would be unable to meet his engagements. He was also insolvent in the sense of not having sufficient property to pay his debts. He seems to have entertained a vague hope that, if not pressed, he might collect some old debts, which have since proved worthless, and realize sufficient to meet his engagements from other sources. But he was pressed, not only by the defendant, but by two other creditors who had attached his property. This the defendant well knew, and those creditors were paid before he was. Thirty or forty days after the payment to defendant the bankrupt, as he says, gave up all hope. Other creditors attached and he sold out and realized all he had to meet those attachments. He admits it would have been better to have gone into bankruptcy. His schedules show unredeemed debts to the amount of fifteen thousand five hundred and eighteen dollars. His assets did not exceed two thousand five hundred dollars, including a book account of one thousand two hundred dollars, of no value. It is not shown that he sustained any losses or contracted any new liabilities subsequently to his payment to defendant. It is, I think, plain that at the time of that payment he was legally insolvent. Such being his condition, the natural and inevitable effects of his payments to the defendant and the other attaching creditors was to give them a preference over the rest. And this effect he must be deemed to have intended. His conduct was not like that of an insolvent who omits to go into voluntary bankruptcy, "a mere passive indifference and inaction where no action is required by positive law or good morals," but the preference was given, and the intent to prefer manifested, by affirmative acts of the most unequivocal character, the effect of which was certain and apparent.

It is observed by the court, in the case so often above cited, that "many find themselves with ample means, good credit, large business, technically insolvent; that is, unable to meet their current obligations as they mature. But by forbearance of creditors, by meeting only such debts as are pressed, and by the submission of some of their property to be seized on execution, they are finally able to pay all and to save their commercial character and part of their property. If creditors are not satisfied with this, and the parties have committed an act of bankruptcy, any creditor can institute proceedings in a bankrupt court; but until this is done their honest struggle to meet their debts and to avoid the breaking up of all their business is not to be construed into an act of bankruptcy, or a fraud upon the act." Under the circumstances mentioned in the above extract, it is plain that neither justice nor sound policy requires the embarrassed though solvent debtor to precipitate his own ruin. While honestly struggling he may pay pressing debts or suffer some of his property to be levied on. But his right to do so can exist only under the circumstances mentioned by the supreme court. He must know that his means are ample, his assets sufficient to pay all his debts, and that his condition is one of merely technical insolvency. His struggle to meet his debts must not only be honest, but made with reasonable ground for expecting a successful issue. He cannot, because he indulges a vague hope that something may occur to add largely to his assets and enable him to pay his debts, distribute his property or its proceeds among preferred creditors until the bankruptcy by which he is speedily overtaken finds him in possession of nothing but the fragments of a wreck. Such I conceive to have been the course pursued by the bankrupt in this case. He can therefore derive no benefit from the liberal and enlightened doctrines recently promulgated by the supreme court.

It remains to inquire whether, at the time he received payment in full of his debt, the defendant had reasonable cause to believe the debtor to be insolvent, and that a fraud on the act was intended. This inquiry must be answered in the affirmative. He had received a dispatch informing him of the bankrupt's return to Red Bluff, and advising him to get his money and communicate the contents of the dispatch to another creditor. The terms of the dispatch, and the fact that it was sent by telegraph, indicated that the business was urgent and quite different from the ordinary collection of a debt from a solvent debtor. On the receipt of this dispatch he instantly commenced suit, and on the arrival of the bankrupt demanded the immediate payment of his debt under a threat that he would attach all his property. He refused to listen to the bankrupt's request for time, although informed by him in effect that he could not pay his indebtedness if pressed. At the time he received his money he knew the bankrupt was pressed, not only by himself, but by other creditors who had

attached his property and had exacted payment.

Under these circumstances no reasonable man could resist the belief that the bankrupt was insolvent, and that in making the payments to the defendant and other creditors he was giving an unlawful preference and committing a fraud upon the act. This inference is confirmed by the testimony of the bankrupt, who swears that before he paid the defendant one dollar the latter told him he knew he was broke. The statutory conditions of the defendant's liability are thus fully satisfied. The bankrupt, being insolvent, has made a payment with intent to give a preference to a creditor who, at the time he received it, had reasonable cause to believe the debtor to be insolvent, and that a fraud on the act was intended. Judgment for plaintiff.